# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LESLIE WILLIAMS,            :
       Plaintiff,          :        CASE NO. 3:14-cv-1181 (VAB)
                           :
       v.              :
                           :
WALTER FORD, et al.,       :
       Defendants.     :        MARCH 16, 2017
                           :

## RULING ON DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT

Plaintiff, Leslie Williams, currently incarcerated, has filed this action *pro se* under 42 U.S.C. § 1983. After this Court granted in part Defendants' Motion to Dismiss, his remaining claims are for retaliation, denial of due process, unconstitutional conditions of confinement, and excessive punishment. *See* Order Granting in Part and Denying in Part Mot. to Dismiss, ECF No. 34, at 20. All of his claims arise from his confinement in restrictive housing for twenty-two days after giving a drawing and poem to a Correctional Officer. The remaining Defendants,[1] Warden Walter Ford, Deputy Warden Dennis Roche, Captain Ernestine Green, and Nurse Joanna Beaulieu ("Defendants"), move for summary judgment on all remaining claims. For the reasons that follow, Defendants' motion is GRANTED in part and DENIED in part.

---

[1] Mr. Williams also included as Defendants in his complaint Warden Timothy D. Farrell, Sr., Nurse Joe Carrara and Deputy Warden Sandy Bundy. Subsequently, Mr. Williams sought to substitute Warden William Faneuff for Warden Timothy Farrell. This motion was granted and the claims against Warden Farrell were withdrawn. *See* Mot. To Amend ¶ 4, ECF No. 6; Initial Review Order at 15, ECF No.7. On December 10, 2015, the Court granted defendants' motion to dismiss all claims against defendants Faneuff, Carrera and Bundy. *See* Order at 20, ECF No. 34.

I.      Standard of Review

A motion for summary judgment may be granted only where there are no issues of material fact

in dispute and the moving party is therefore entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a); *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009).  The moving party may satisfy his burden

"by showing—that is pointing out to the district court—that there is an absence of evidence to support

the nonmoving party's case."  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per

curiam) (internal quotation marks and citations omitted).  Once the moving party meets this burden,

the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *Wright*

*v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue of fact means that "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*.,

477 U.S. 242, 248 (1986).  While genuineness runs to whether disputed factual issues can 'reasonably

be resolved in favor of either party,' ... materiality runs to whether the dispute matters, i.e., whether it

concerns facts that can affect the outcome under the applicable substantive law."  *Graham v.*

*Henderson*, 89 F.3d 75, 79 (2d Cir.1996) (quoting *Anderson*, 477 U.S. at 250).  The nonmoving party

"must offer some hard evidence showing that its version is not wholly fanciful."  *D'Amico v. City of*

*New York*, 132 F.3d 145, 149 (2d Cir. 1998).

II.     Factual Allegations[2]

Mr. Williams is confined to the custody of the Connecticut Department of Correction and is

serving a life sentence.  Defs.' L.R. 56(a) Stmt., ECF No. 47-2, at ¶¶ 1-2.  Nurse Beaulieu is a

---

[2] The factual allegations are taken from the parties' Local Rule 56(a) Statements and supporting exhibits.  *See* Defs.' L.R. 56(a) Stmt., ECF No. 47-2; Pl.'s L.R. 56(a)(2) Stmt.. ECF No. 50, 16-23.  Mr. Williams filed his opposition on August 19, 2016.  On August 29, 2016, he moved for an extension of time to respond to Defendants' motion.  The Court ordered that any supplemental opposition papers must be filed by September 2, 2016.  Order, ECF No. 52.  No additional papers were filed.

registered nurse.  *Id.* at ¶ 3.  In February 2013, Nurse Beaulieu worked for the Connecticut Department of Correction at the Hartford Correctional Center.  *Id.* at ¶ 4.  As part of her duties, she triaged inmates for medical issues and referred inmates to the medical doctor or mental health unit as required.  *Id.* at ¶ 5.  She also distributed medication and toured the housing units.  *Id.* at ¶ 5.

On February 7, 2013, Nurse Beaulieu was in the South Block at Hartford Correctional Center. Defs.' L.R. 56(a) Stmt. ¶ 6.  Defendant Beaulieu states that Mr. Williams gave her a folded piece of paper.  *Id.*  She assumed it was an Inmate Request form seeking medical assistance.  *Id.* at ¶ 7.  She unfolded the paper as she was walking away and realized it was a drawing of her and a love poem.  *Id.* Defendant Beaulieu states that she knew the drawing was of her because the figure had similar features and wore a scrub shirt with a distinctive logo and her necklace.  *Id.*  After reading the note Nurse Beaulieu felt "uncomfortable, scared, and threatened."  *Id.* at ¶ 8 (citing Beaulieu Aff., Defs.' L. R. 56(a) Stmt., Ex. 1, ECF No. 47-4, ¶ 7).

Before this incident, Defendant Beaulieu felt uncomfortable around Mr. Williams because "he would stare at [her] and make inappropriate comments about [her] appearance."  Beaulieu Aff. ¶ 7. Defendant Beaulieu reported the incident to the deputy warden and requested a separation profile between her and Mr. Williams.  Def's L.R. 56(a) Stmt. ¶ 9.  Department of Corrections staff can request a separation profile to determine that "an inmate poses a threat or risk" to that staff member. Green Aff., Defs.' L. R. 56(a) Stmt., Ex. 2, ECF No. 47-5, 17.  If the profile request is granted, the DOC will not put the inmate in the same correctional facility as the staff member.  *Id.*  After receiving Mr. Williams' note, Nurse Beaulieu also wrote an incident report.  Defs.' L. R. 56(a) Stmt. ¶ 10.

Mr. Williams claims that he is an aspiring artist and only showed the note to Nurse Beaulieu because he thought she would appreciate his artwork.  Williams Decl. ¶ 12.  He further claims that the

note was not a love poem and the language was not threatening.  *Id.*  Furthermore, Mr. Williams

emphasizes that Nurse Beaulieu chose to accept the note and open it later.  *Id.* at ¶ 9.  Mr. Williams

alleges that Defendant Beaulieu violated prison directives by engaging in undue familiarity with him

by accepting the note.  *Id.*  He also states that Defendant Beaulieu never expressed any discomfort

around Mr. Williams before he gave her the drawing.  *Id.* at ¶ 15.  Finally, he notes that prison officials

never notified him that female staff members felt uncomfortable around him.

A.  Administrative Detention Policies in the Connecticut Department of Corrections

In Connecticut Department of Corrections facilities, Administrative Detention is a restrictive

status applied only in certain circumstances.  *See* Conn. Dep't of Corr. Admin. Directive 9.4(3)(B)(2),

effective June 16, 2016.[3]  According to the Directive, Administrative Detention is appropriate "[f]or

the investigation of an allegation or information involving the inmate in the commission of a crime, or

of activities jeopardizing the security of the facility or the safety of staff or inmates that could result in

placement on punitive or administrative segregation or transfer to high security."  *Id.*  The Directive

allows prison officials to authorize placement in Administrative Detention for up to fourteen days,

unless an Administrative Segregation hearing is pending.  *See* Conn. Dep't of Corr. Admin. Directive

9.4, Att. B, effective June 16, 2016.  While an inmate is on Administrative Detention, the warden or

his designee is supposed to conduct a 72-hour review of the plaintiff's status. *See id.* (requiring review

"every 72 hours by the Unit Administrator or designee and recorded on Restrictive Housing Order");

*see also* Defs.' L.R. 56(a) Stmt. ¶ 28.

---

[3] The Court takes judicial notice of page five of Administrative Directive 9.6 which appears on the Department of Correction's website, *see* http://www.ct.gov/doc/LIB/doc/PDF/AD/ad0904.pdf (last visited Mar. 7, 2017).  The Court can take judicial notice of the State of Connecticut Administrative Directives on the Department of Correction's website. *See Nicholson v. Murphy*, No. 3:02-cv-1815 (MRK), 2003 WL 22909876, at *7, n.2 (D. Conn. Sept. 19, 2003) (citation omitted) (taking judicial notice of the Administrative Directives as "written guidelines, promulgated pursuant to Connecticut General Statutes § 18-81, that establish the parameters of operation for Connecticut correctional facilities.").

B. Administrative Detention of Mr. Williams

Captain Green, a correctional lieutenant at Hartford Correctional Center, oversaw the Restrictive Housing Unit and conducted investigations within the facility.  Defs.' L.R. 56(a) Stmt. ¶ 13.  She had the authority to place inmates on Administrative Detention in the Restrictive Housing Unit.  *Id.* at ¶ 14.

On February 7, 2013, Defendant Green learned from her supervisor that Mr. Williams had given Nurse Beaulieu an inappropriate note.  *Id.* at ¶ 15.  Defendant Green met with her supervisor and Defendant Beaulieu to discuss the incident and review the note.  *Id.*  Defendant Green "had previously heard many complaints from other female staff members that Mr. Williams would often stare at them inappropriately and had a long history of making female staff members feel uncomfortable around him."  Green Aff. ¶ 8.  Nurse Beaulieu also reported to Defendant Green that Mr. Williams made her feel uncomfortable.  *Id.* at ¶ 9.  Ms. Green concluded that Mr. Williams had an "inappropriate fixation" on Nurse Beaulieu and that Mr. Williams posed a safety threat to her.  *Id.* at ¶ 10. On February 7, 2013, Defendant Green submitted a separation profile request to her supervisor because she thought Mr. Williams posed a safety threat to Defendant Beaulieu.  Green Aff. ¶ 18.  She also submitted a supplemental page to the incident report.  *Id.*

Defendant Green conducted an investigation of the incident.  Defs.' L.R. 56(a) Stmt. ¶ 20.  She met with Mr. Williams in his cell where, after initial denials, Mr. Williams admitted to the incident.  *Id.*  Defendant Green told Mr. Williams that he would be transferred to the Restrictive Housing Unit pending the investigation.  *Id.*  Defendant Green and her supervisor, Deputy Warden Roche, decided to transfer Mr. Williams to the Restrictive Housing Unit on Administrative Detention status.  Defs.' L. R. 56(a) Stmt. ¶ 24.  On February 7, 2013, prison officials transferred Mr. Williams to the Restrictive

Housing Unit.  *Id.* at ¶¶ 21-22.  Captain Green does not know whether the warden or his designee conducted a 72-hour review of Mr. Williams' Administrative Detention.  *Id.* at ¶ 20.

The parties dispute the conditions in the restrictive housing cell.  Defendants contend that a video of the transfer shows that the cell was clean and appropriate for housing Mr. Williams.  Defs.' L.R. 56(a) Stmt. ¶¶ 23-24.  On the other hand, Mr. Williams alleges that his cell lacked hot water and was cold, unsanitary, and infested with insects.  Williams Decl. ¶ 30.  He claims that the video did not show the corners of the room, the condition of the mattress, or whether the sink had running hot water. *Id.* at ¶ 23.  He also alleges that, because he was in Administrative Detention, he was not able to access the prison commissary and could not purchase toiletries or other necessities, and that prison officials did not otherwise make these items available to him.  *Id.* at ¶ 29.

Defendant Green does not recall speaking to Mr. Williams on February 19, 2013.  Green Aff. ¶ 21.  If she had learned that Mr. Williams' cell was unclean or required maintenance, she allegedly would have "immediately addressed those issues."  *Id.*  On February 20, 2013, Defendant Green had not heard from her supervisor regarding the request for a separation profile between Defendant Beaulieu and Mr. Williams.  *Id.* ¶ 22.  As a result, she continued Mr. William's placement in the Restrictive Housing Unit pending the outcome of the request.  *Id.*  Mr. Williams contends that Defendant Green did not have the authority to continue his placement.

On February 27, 2013, Mr. Williams was still in the Restrictive Housing Unit.  Defs.' L.R. 56(a) Stmt. ¶ 31.  Because he had been there for over twenty days, Warden Ford ordered Mr. Williams' release from the Restrictive Housing Unit.  Ford Aff., Defs.' L. R. 56(a) Stmt., Ex. 3, ECF No. 47-6, ¶ 8.  He instructed prison staff to tell Defendant Beaulieu not to interact with Mr. Williams or go into the area where he was housed.  *Id.*

III.   <u>Discussion</u>

There are three claims remaining in this case: (1) procedural due process and retaliation against Defendants Roche, Green, and Beaulieu based on Mr. Williams' placement on Administrative Detention in the Restrictive Housing Unit for his drawing and poem; (2) unconstitutional conditions of confinement in the Restrictive Housing Unit against Defendant Green, and (3) excessive punishment against Defendants Ford, Roche, and Green based on Mr. Williams' confinement on Administrative Detention without penological justification.  Defendants move for summary judgment, arguing that Mr. Williams failed to exhaust his institutional remedies and to state cognizable claims under the First, Eighth, or Fourteenth Amendments.  Defendants' motion is granted in part and denied in part.  Mr. Williams failed to exhaust the administrative remedies available for his First and Eighth Amendment claims.  Genuine issues of material fact remain, however, concerning his due process claim, making summary judgment inappropriate on that claim.

A.   <u>Exhaustion of Administrative Remedies</u>

Defendants argue that Mr. Williams failed to exhaust his administrative remedies for one of his three claims.  Defs.' Mem., ECF No. 47-1, 8.  On January 30, 2017, the Court ordered the parties to submit additional briefing on exhaustion of administrative remedies with regard to the other two claims.  *See* Order re: Exhaustion, ECF No. 54.  On March 3, 2017, Defendants filed their response to the order.  *See* Response, ECF No. 55.  Mr. Williams did not respond to the order.

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), requires inmates to exhaust their administrative remedies before filing an action in federal court concerning any aspect of prison life. *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  Section 1997e requires exhaustion of any available administrative remedies, regardless of whether they provide the relief the inmate seeks.  *See Booth v.*

7

*Churner*, 532 U.S. 731, 741 (2001).  A claim is not exhausted until the inmate complies with all administrative deadlines and procedures.  *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006).  Informal efforts to put prison officials on notice of inmate concerns do not satisfy the exhaustion requirement.  *See Marcias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).  If the deadline to file a grievance about an issue has passed, claims concerning that issue are unexhausted and barred from federal court.  *See Woodford*, 548 U.S. at 95.  Additionally, courts require inmates to take advantage of each step of an administrative appeal procedure in order to exhaust their administrative remedies.  *See, e.g., Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001) ("[G]rievances must now be fully pursued prior to filing a complaint in federal court.").  The inmate therefore must exhaust his administrative remedies for each claim he asserts in federal court.  *See Baldwin v. Arnone*, No. 3:12-cv-243(JCH), 2013 WL 628660, at *5 (D. Conn. Feb. 18, 2013).

An inmate may be excused from the exhaustion requirement, but only if administrative remedies were not "available."  *Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1858 (2016).  The Supreme Court has identified three circumstances where an administrative remedy, although officially available, cannot be used by inmates to obtain relief.  *Id.* at 1859.  First, the administrative remedy may operate as a "dead end" where the office to which inmates are directed to submit all grievances disclaims the ability to consider them.  *Id.*  Second, the procedures may be so confusing that no ordinary prisoner could be expected to "discern or navigate" the requirements.  *Id.*  And third, prison officials may "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 1860.

An inmate in a Connecticut state correctional facility who wishes to file a grievance must follow the procedure set forth in Department of Correction Administrative Directive 9.6.  *See* Defs.'

Mem. Ex. 4, Att. A, ECF No. 47-7 at 6-18.  Under the Directive, full administrative review generally

occurs in three steps.  First, an inmate must seek to resolve his complaint informally by depositing an

Inmate Request Form (CN 9601) in a designated collection box.  If the inmate is dissatisfied with the

response to his Inmate Request Form or does not receive a response within fifteen days, the inmate

may proceed to the second step, which is termed "Level 1 Review."  To initiate Level One Review, an

inmate completes the Inmate Administrative Remedy Form (CN 9602).  At this point, the inmate is

required to provide evidence that he attempted to resolve his grievance informally by attaching the

Inmate Request Form (CN 9601) to CN 9602.  *Id.* at 9.6(6)(C).  The inmate also has the option of

submitting CN 9602 without attaching CN 9601 and providing a "valid reason" why he could not

obtain the form.  *Id.*  Level 1 Review is undertaken by the Unit Administrator, who must respond to the

grievance in writing within thirty days.  *Id.*

 An inmate may proceed to the third step, Level 2 Review, if he disagrees with the Unit

Administrator's judgment or does not receive a timely response.  Administrative Directive, 9.6(6)(K).

Generally, Level 2 Review takes place before a District Administrator.  The Administrator's response,

which must be delivered to the grievant in writing within 30 business days of the receipt of the appeal,

must include a statement saying whether the grievance was upheld or compromised or was denied or

rejected.  *Id.*  Level 3 appeals are restricted to challenges to department policy or the integrity of the

grievance procedure and to appeals of Level 2 grievances to which the District Administrator has

failed to respond in a timely manner.  *See id.* at 9.6(6)(L).

 Mr. Williams has filed only one grievance relating to the claims in this action.  Defendants

have submitted a copy of the grievance and appeal.  *See* Defs.' Mem., Ex. 4, Att. B, ECF No. 47-7 at

20-24.  In the grievance, Mr. Williams challenges the duration of his stay in restrictive housing and the

conditions of the cell. *Id.* He argues that the length of time was too long for the alleged investigation and he was not provided required reviews of his status. *Id.* Mr. Williams also contends that he was sent to restrictive housing in retaliation for showing his drawing and poem to Nurse Beaulieu. *Id.* Prison officials denied the grievance and Mr. Williams appealed the denial. *Id.* at 23. Mr. Williams attached a statement to the grievance appeal form stating that he is appealing the length of time he was held on Administrative Detention status and the fact that procedures for review of his detention were not followed. Mr. Williams concedes that he was wrong to attempt to convert his professional relationship with Defendant Beaulieu to a personal one and decries the loss of his prison job. *Id.* at 21.

The District Administrator received Mr. Williams' appeal form on April 3, 2013 but, citing an "administrative error," did not respond until March 17, 2014. Defs.' Mem., Ex. 4, Att. B, 20 (form CN 9604, stamped "received" on April 3, 2013, but listing March 17, 2014 as the "date of disposition," and stating "due to an administrative error your grievance was receipted by the ARC but never forwarded for Level 2 review."). The District Administrator's response focused on the placement and duration of Mr. Williams' restrictive housing status, and stated that: "Your placement/duration of restrictive status may not have been followed in accordance with Administrative Directive 9.4 Restrictive Status." *Id.* The Administrator added that "Warden Farrell has been directed to have all appropriate staff review the AD 9.4 to ensure further compliance with Department policy" and formally concluded that the appeal was "compromised."[4] *Id.* The Level 2 reviewer indicated that Mr. Williams could appeal the disposition to Level 3. *Id.* Neither party submitted evidence that Mr. William filed a Level 3 appeal,

---

[4] The Administrative Directive notes that when a grievance or request for remedy is "compromised," "the application for administrative remedy has sufficient merit that some modification of the existing decision is warranted." *Id.* at 3(C). Because prison officials did not reach this conclusion until March 2014, over a year after Mr. Williams was released from the Restrictive Housing Unit, it is unclear how defendants could have resolved his grievance other than by instructing staff to avoid a recurrence.

and the Court ordered supplemental briefing.  *See* Order re: Exhaustion.

In response to the Court's Order, Defendants state that the District Administrator's Office has informed them that the box indicating the availability of a Level 3 appeal was checked in error and that Mr. Williams has exhausted his administrative remedies for the claims included in his Level 2 appeal. *See* Defs.' Resp., ECF No. 55, 2.  The Court concludes, therefore, that Mr. Williams has exhausted his administrative remedies with regard to the claims challenging the duration of his confinement on Administrative Detention in the Restrictive Housing Unit and the lack of the 72-hour review required under the directive.

Mr. Williams did not reference the conditions in the restrictive housing cell or acts of retaliation in response to his exercise of freedom of speech in his statement of reasons for the appeal. On his appeal form, he stated: "This appeal stems from the denial of my grievance regarding DOC Policy and Procedure not because of the fact that I was placed on Administrative Detention, but the duration for which I was held on that particular status."  Defs.' Mem. Ex. 4, Att. B, ECF No. 47-7, 21. Mr. Williams argues that the Directive does not state that the inmate needs to specify each element being appealed.  Pl.'s Mem., 9.  He contends that, by attaching the entire Level 1 grievance, he sufficiently alerted the reviewer that he was appealing all issues raised at the Level 1.  *Id.* ("[N]owhere in Administrative Directive 9.6 does it stipulate grievants must draft the language of each detailed claim onto the Level 2 Appeal form in order to properly exhaust these claims."); *see also* Pl.'s Local Rule 56(a)2 Statement, ¶ 57.  The Court disagrees.

The grievance appeal form specifically asks for the reason for the appeal.  *See* Defs.' Mem. Ex. 4, Att. B, 20.  In response to that question, Mr. Williams attached a full page explaining his reasons for the appeal.  *See id.* at 21.  Those reasons focus on the duration of confinement and the fact that

departmental procedures regarding review of his status were not followed.  "The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance." *Woodford*, 548 U.S. at 95.  In light of the question on the appeal form and Mr. Williams' specific answer, the Court concludes that the reviewer was not made aware that Mr. Williams was appealing all issues raised in the Level 1 grievance.[5]  Thus, the reviewer did not have a fair opportunity to consider any reasons for appeal that were not included in the statement.  Defendants' motion for summary judgment is granted on the First and Eighth Amendment claims on the ground that Mr. Williams failed to exhaust his administrative remedies.  The retaliation claim was the only remaining claim against Nurse Beaulieu, so the Clerk is directed to terminate her as a Defendant in this case.

B.    Procedural Due Process

Mr. Williams challenges the duration of his placement on Administrative Detention as a violation of his Fourteenth Amendment right to due process.  To state a claim for violation of procedural due process in connection with his placement in segregation, Mr. Williams must show that he had a protected liberty interest in being free from Administrative Detention and that Defendants deprived him of that interest without affording him due process of law.  *See Sandin v. Conner,* 515 U.S. 472 (1995) (confinement in the restrictive housing unit for thirty days for disciplinary reasons did not implicate a constitutional liberty interest because it did not "present a dramatic departure from the basic conditions of the [inmate's] sentence.").

To determine whether the placement of a plaintiff in disciplinary segregation, Administrative Detention, or another form of "discretionary confinement" implicates an inmate's liberty interest, the

---

[5] Directive 9.6(5) sets forth general provisions that apply to all administrative remedies.  Subsection E(3) provides:  "The request for an administrative remedy and the action sought should be stated simply and coherently."  Defs.' Mem. Ex. 4, Attachment A, ECF No. 47-7 at 9.  The Court considers this general direction to apply equally to grievance appeals.

Court must determine whether the confinement imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Nwaokocha v. Sadowski,* 369 F.Supp.2d 362, 373 (E.D.N.Y.2005) (citing *Sandin*, 515 U.S. at 487).  In other words, when an inmate's experience is "within the range of confinement to be normally expected" by a prisoner, his or her due process rights are not violated by the confinement.  *Tellier v. Fields*, 280 F.3d 69, 81 (2d Cir. 2000) (citing *Sandin,* 515 U.S. at 484).  Courts have applied *Sandin*'s guidance broadly to evaluate claims concerning Administrative Detention, disciplinary segregation, confinement in a Special Housing Unit ("SHU"), and "segregation on justified suicide watch."  *Nwaokocha,* 369 F.Supp.2d at 373; *see also Arce v. Walker,* 139 F.3d 329, 335 (2d Cir. 1998) (refusing to distinguish between prison restraints imposed for disciplinary and administrative purposes).

Connecticut Department of Corrections policies permit Administrative Detention in certain circumstances.  In Mr. Williams' case, the Department cited Administrative Directive 9.4, which allows for Administrative Detention for investigatory purposes.  *See* Admin. Directive 9.4(3)(B)(2). Under this part of the Administrative Directive, detention is appropriate "[f]or the investigation of an allegation or information involving the inmate in the commission of a crime, or of activities jeopardizing the security of the facility or the safety of staff or inmates that could result in placement on punitive or administrative segregation or transfer to high security."  *Id.*  Because the Administrative Directive limited the use of Administrative Detention to certain situations, the Directive created a liberty interest in avoiding Administrative Detention.  *See Walker v. Quiros*, No. 3:11-CV-82(MPS), 2014 WL 7404550, at *8 (D. Conn. Sept. 30, 2014) (concluding that Administrative Directive 9.4 "creates a liberty interest in avoiding Administrative Segregation" by requiring prison officials to use

"notice and a hearing" before placing an inmate in Administrative Detention and by "limiting the use of Administrative Detention to certain situations.").

The Court next considers whether Mr. Williams' confinement in Administrative Detention imposed an atypical and significant hardship on him.  In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court considered what process prison officials must afford inmates before classifying them for placement in Ohio's highest security prison.  In determining whether the inmates had a liberty interest in avoiding confinement in Ohio's Supermax facility, the Court applied the standard set forth in *Sandin*.  *See id.* at 223.  The Court clarified that the focus of the due process inquiry is the atypicality prong, not the language of the pertinent state regulations.  *See id.*  The Court concluded that the restrictive conditions at Ohio State Penitentiary "taken together [] impose[d] an atypical and significant hardship" on inmates and gave "rise to a liberty interest in their avoidance."  *Id.* at 224.

"[T]he duration of [segregated] confinement is a distinct factor bearing on atypicality and must be carefully considered." *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir.2000).  Because both confinement under harsh conditions for a short time and confinement under less harsh conditions for a longer time may be atypical, however, the Second Circuit has "avoided a bright line rule that a certain period of [restrictive housing] confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (citing *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999).  Where a detailed factual record is lacking, the Second Circuit has "affirmed the dismissal of due process claims only in cases where the period of time spent in [restrictive housing] was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in [restrictive housing]—and there was no indication that the plaintiff endured unusual [restrictive housing] conditions."  *Palmer*, 364 F.3d at 66 (citing cases); *see Harnage v. Brighthaupt*, 168 F. Supp. 3d 400, 412 (D. Conn. 2016)

14

(granting summary judgment on due process claim where inmate served 20 days in punitive segregation and inmate "alleged no facts suggesting that sanctions were qualitatively different from ordinary prison life").

Mr. Williams has filed a declaration which includes a description of the conditions in the Restrictive Housing Unit.  Defendants do not address the atypicality of the conditions in the Restrictive Housing Unit.  They merely conclude that, because Mr. Williams remained in the Restrictive Housing Unit for less than thirty days, his claim is not cognizable.  In their discussion of the conditions of confinement claim, Defendants direct the Court to the affidavit of Defendant Green and a video recording of Mr. Williams' transfer to the Restrictive Housing Unit.  *See* Defs.' Mem. Ex. 2 & Ex. A to Ex. 2, ECF No. 47-5 (DVD manually filed).

The recording, however, affords only a limited view of the side and back walls of the cell from waist to above-head height.  The bunk is visible with a mattress on the bunk, but the condition of the mattress cannot be ascertained.  The recording provides no evidence regarding Mr. Williams' claims that the Restrictive Housing Unit lacked hot water, that it was uncomfortably cold, that it had dirt and insects on the floor, and that it had webs and insect nests at the ceiling.  Thus, the Court is left with the declaration and opposing affidavit.  Without a more developed factual record, the Court cannot determine whether Mr. Williams experienced conditions constituting an atypical and significant hardship.  Accordingly, Defendants' motion for summary judgment is denied as to the due process claims against Defendants Green and Roche.

C.    Warden Ford

Mr. Williams includes Warden Ford as a Defendant.  The Supreme Court has held that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates

under a theory of respondeat superior." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009). Rather, a plaintiff must show that "the official's own individual actions" violated the Constitution. *Id.* "A defendant's supervisory authority is insufficient in itself to demonstrate liability under § 1983." *LaMagna v. Brown,* 474 F. App'x 788, 789 (2d Cir. 2012). "A supervisor may be held liable [only] if he or she was personally a direct participant in the constitutional violation. *Terebesi v. Torreso,* 764 F.3d 217, 234 (2d Cir. 2014). "In this Circuit, a direct participant includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally." *Id.* (internal quotation marks and citations omitted).

Mr. Williams' only allegations against Warden Ford are that he denied Mr. Williams' grievance, did not perform the required review of Mr. Williams detention, and that he considered Mr. Williams to have been held in Administrative Detention for too long a time and ordered his release. *See* Williams Decl. ¶ 33. Mr. Williams also states that he did not conduct a 72-hour review but delegated that task to his subordinates. *Id.* at ¶ 34. In opposition, Defendants have submitted the affidavit of Warden Ford. *See* Ford Aff. Mr. Ford states that the initial placement of Mr. Williams on Administrative Detention was appropriate. *Id.* Mr. Williams does not challenge his initial placement. Mr. Williams fails to allege any facts showing that Warden Ford was aware of Mr. Williams' placement in the Restrictive Housing Unit at the time it occurred, participated in his placement in any way, or was aware that no reviews were conducted. The Court concludes that Mr. Williams fails to allege facts demonstrating the personal involvement of Warden Ford. Accordingly, all claims against Warden Ford are dismissed under 28 U.S.C. § 1915A(b)(1).

D.    Qualified Immunity

Defendants also contend that they are protected by qualified immunity. Qualified immunity attaches when an official's conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mullenix v. Luna,* 577 U.S ___, ___, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  Although the Supreme Court's case law "'do[es] not require a case directly on point'" before a right is considered to be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Id.* at ——, 136 S. Ct., at 308 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see also Taylor v. Barkes*, ___ U.S. ___, ___, 135 S. Ct. 2042, 2044 (2015) ("To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.").  Qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'"  *Mullenix*, 577 U.S. at ___, 136 S. Ct. at 308 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Defendants bear the burden of proving they are entitled to qualified immunity.  *See Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013).

The Supreme Court has cautioned the lower courts many times that "'clearly established law' should not be defined 'at a high level of generality.'"  *White v. Pauly*, ___ U.S. ___, ___, 137 S. Ct. 548, 551 (2017) (quoting *al-Kidd*, 563 U.S. at 742).  Rather, clearly established law "must be 'particularized' to the facts of the case."  *Id.* at ___, 137 S. Ct. at 551 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).   For example, in *White*, the Court noted that recognition that the case "presents a unique set of facts and circumstances" should have put the court of appeals on notice that the officer's conduct did not violate a clearly established right.  *Id.* at ___, 137 S. Ct. at 552.

Here, Mr. Williams was placed in Administrative Detention in accordance with departmental policies.  Those policies required prison officials to review a Detention placement every 72 hours and allowed them to authorize placement for up to fourteen days unless an Administrative Segregation hearing is pending.  Mr. Williams was held for twenty-two days.  The Supreme Court has long required that a hearing "occur within a reasonable time following an inmate's transfer" to segregated confinement.  *See Hewitt v. Helms*, 459 U.S. 460, 476 n.8 (1983).  Mr. Williams had no hearing.

Defendants focus on Mr. Williams' drawing and argue that he has no constitutional right to draw inappropriate or threatening images of correctional staff.  They also argue that Defendant Green correctly placed Mr. Williams on Administrative Detention while the incident was being investigated.  As noted above, Mr. Williams does not challenge his initial placement on Administrative Detention.  The issue, rather, is the length of Mr. Williams' confinement in Administrative Detention and the lack of review.  As Defendants have not addressed this claim, they have not demonstrated that their actions are protected by qualified immunity.  The motion for summary judgment is denied on this ground.

IV.   Conclusion

Defendants' motion for summary judgment [**ECF No. 47**] is **GRANTED** as to the First Amendment retaliation claim and the Eighth Amendment conditions of confinement claim and **DENIED** in all other respects.  The claims against Warden Ford are **DISMISSED** under 28 U.S.C. § 1915A(b)(1).  The Clerk is directed to terminate Nurse Beaulieu and Warden Ford as Defendants in this case.

The case will proceed to trial on the due process claim against Defendants Roche and Green based on the duration of Mr. Williams' stay in Administrative Detention and the lack of review.

As this case will proceed to trial, Mr. Williams' motion for appointment of counsel [**ECF No.**

18

**53**] is **GRANTED**.  The Clerk is directed to attempt to secure counsel for Mr. Williams from the Civil

Pro Bono Panel.

      **SO ORDERED** at Bridgeport, Connecticut, this 16th day of March 2017.


                /s/ Victor A. Bolden           
                Victor A. Bolden
                United States District Judge